UNITED STATES of America, Appellee,

v.

INGREDIENT TECHNOLOGY CORPO-
RATION, formerly known as SuCrest
Corporation, and Robert M. Rapaport,
Appellants.

Nos. 124, 144, Dockets 82–1128, 82–1144.

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1982.

Decided Jan. 5, 1983.

Jules Ritholz, Kostelanetz & Ritholz, New York City (Elliot Silverman, David Axelrod, Kostelanetz & Ritholz, New York City, of counsel), for appellant Ingredient Technology Corp.

Frederick T. Davis, Patterson, Belknap, Webb & Tyler, New York City (Leslie C. Levin, Patterson, Belknap, Webb & Tyler, New York City, of counsel), for appellant Rapaport.

Minna Schrag, Asst. U.S. Atty., S.D.N.Y., New York City (Charles M. Carberry, Warren Neil Eggleston, Walter P. Loughlin, Asst. U.S. Attys., William M. Tendy, Acting U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before OAKES and WINTER, Circuit Judges, and METZNER, District Judge.*

OAKES, Circuit Judge:

This appeal is by a corporation and its former president from judgments of conviction for tax fraud by means of year-end LIFO ("last-in-first-out") inventory overstatement. The principal arguments of both defendants before the jury in a trial in the United States District Court for the Southern District of New York, Robert L. Carter, Judge, were that the inventory was not overstated because the corporation in fact had legal title on the year-end date to the property in question—raw sugar—even though it had previously agreed to resell it to its seller, and that in any event the element of willfulness was negated because the tax laws were too unclear for the defendants to have known that they had committed a crime. Other arguments based on evidentiary rulings, the court's charge, the statute of limitations, the proof, and a claim that a corporation as a matter of law cannot be convicted of perjury under 26 U.S.C. § 7206(1) are made on appeal. We affirm the convictions.

## FACTS

The appellants include Ingredient Technology Corp., which used to be known as SuCrest Corp., and its former president,

* Of the Southern District of New York, sitting by designation.

Robert M. Rapaport. These two were charged in a five-count indictment along with SuCrest's treasurer, Allerton D. Marshall, who was acquitted on all charges. SuCrest and Rapaport were convicted on Count One for conspiracy to evade SuCrest's corporate income tax for fiscal 1975 (18 U.S.C. § 371). Count Two, on which the jury was unable to agree, is irrelevant here. SuCrest and Rapaport were convicted on Count Three for conspiracy to defraud the United States by impeding the Department of the Treasury in the collection of revenue in connection with SuCrest's federal income tax for fiscal 1976 (18 U.S.C. § 371). SuCrest was convicted on Count Four for its subscribing to a false federal income tax return in fiscal 1975 (26 U.S.C. § 7206(1)); this is the count for which SuCrest claims it cannot be liable as a matter of law. Rapaport was convicted on Count Five for assisting SuCrest in the presentation of a false corporate federal income tax return for fiscal 1975 (26 U.S.C. § 7206(2)).

During 1974 through 1976 SuCrest, a publicly traded company with annual sales in the hundreds of millions of dollars, was principally in the sugar refining and sales business, buying raw sugar for refining from brokers (operators) who either imported raw sugar or bought it from domestic producers. SuCrest had never been in the business of selling raw sugar or buying raw sugar for resale. Rapaport, who was president and chief executive officer of SuCrest, actively participated in the operation of the Sweetener Division which refined and resold refined sugar, and in the tax years in question his approval was required for every purchase of raw sugar. These purchases at any one time involved ten to twenty tons.

In 1974 the price of raw sugar began to fluctuate widely and although SuCrest was making large gross profits as a result of price fluctuations upward, taxes on those profits and the escalating cost of raw sugar depleted its income. Like many other United States sugar refiners, SuCrest switched in 1974 to the LIFO inventory accounting method for its "raw sugar and raw sugar content in goods in process and in finished goods." Under LIFO, of course, the most recently purchased raw materials represent the cost of inventory attributable to costs of goods sold. In this inflationary period, therefore, LIFO produced a higher cost of goods sold which in turn resulted in lower taxable income than the FIFO (first-in-first-out) method formerly used. Moreover, LIFO more accurately reflected real costs because profits had to be reinvested in increasingly expensive raw materials. Thus in the fiscal year in which SuCrest adopted the LIFO accounting method—1974—it was able to report and to carry forward a loss of about $14.7 million as opposed to a taxable income of $12.2 million which it otherwise would have had to report. This substantial tax saving occurred as a result of large purchases of raw sugar; SuCrest accumulated an unusually large inventory of about 194 million pounds which thereupon constituted what is called the "LIFO base." In SuCrest's case this was valued at about ten cents per pound and, as the accountants insist to those who adopt the LIFO method, it was important to maintain this LIFO base, because if the amount of sugar fell below its level, then an equivalent amount of sugar valued at only ten cents per pound (as opposed to higher subsequent prices) would have to be attributed to that given year's cost of goods sold, with the result that profits and taxes would be increased.

In 1975 and 1976, with both raw sugar prices and interest rates increasing, SuCrest operated its refineries with as little raw sugar on hand to be processed as possible, slightly less than 100 million pounds or about half of the 1974 year-end inventory or LIFO base. Because this would have caused large 1975 profits and taxes, it was determined to add enough raw sugar to the inventory level so as not, in accounting terms, to "invade" the LIFO base before the end of the fiscal year, in this case May 31, 1975. SuCrest could have done so simply by purchasing raw sugar on the open market, but such a purchase would involve market risks, capital outlay, possibly high interest expenses, and the like. Manage-

ment set upon another course, resulting in the instant convictions.

The method adopted had the overall effect of involving no financial risk, with title to sugar being taken before the end of the fiscal year but immediately thereafter resold to the seller, with the sugar never entering any flow of raw materials for the refining process, and the only expense being the payment of a small fee to the cooperating operator. More specifically, what was done was the following.

Arrangements were made with one of SuCrest's operators, Czarnikow-Rionda Co. (Rionda), whereby it would sell to SuCrest the quantity of raw sugar SuCrest needed to protect its LIFO base and SuCrest would then sell the raw sugar back to Rionda so that SuCrest would be able to claim formal title without having to take physical delivery and with neither side making a profit on the transaction. In addition, SuCrest and Rionda engaged in an elaborate pricing formula hinged to the market value of raw sugar on the futures exchange because the volatile price fluctuations in the sugar market could result in a resale at a price different from the original purchase price so that neither SuCrest or Rionda would stand to lose on what was intended to be simply a bookkeeping transaction. It was agreed that Rionda would sell sugar to SuCrest at 1.075 cents per pound above the July 1975 futures price on the New York Coffee and Sugar Exchange on the day of the sale and buy the sugar back at 1.0 cent above that same futures price on the day of the resale, with the difference of .075 cent going to Rionda as the only SuCrest expense in the transaction. Then SuCrest and Rionda each agreed to take opposite and identical futures positions on the Exchange, which in turn assured no gain or loss for either party since any gain from the resale of the physical sugar as the result of an increase in sugar price would be matched and offset by an equivalent loss on the futures contracts or vice versa.

SuCrest's contract to purchase 50,000 long tons of raw sugar from Rionda, executed on April 18, 1975, the day SuCrest and Rionda opened their futures positions, was in writing. Rionda's agreement to repurchase was not. Supposedly because of "gossip among sugar buyers," SuCrest brief at 12, Rapaport cautioned one of his juniors not to discuss the details of the Rionda transaction "on the street."

Prior to the close of the SuCrest fiscal year, Rionda in accordance with the purchase contract "declared" to SuCrest title to the cargoes of the two ships Ally and St. Etienne involving 41,755 long tons of raw sugar. It turned out that the remaining 8,245 long tons due under the contract were not required by SuCrest to maintain its LIFO base and they were declared after the end of SuCrest's fiscal year in June 1975. Almost immediately thereafter and while the vessels were still at sea, the same sugar was resold to Rionda. Checks were exchanged for the purchase and resale and for the net changes in the futures positions. SuCrest never actually drew on its funds to pay the nearly $29 million due for the sugar. Rionda made its "commission" of $84,000. Except for satisfying the accountants and the lawyers and ultimately the Government, the transaction was at an end.

Significantly, two facts were not disclosed until a later time. One was that Rionda's vice president, who had entered into the understanding with SuCrest as to the overall transaction, had about a week after April 18 asked for a letter that would set out the terms of the resale, a letter which a SuCrest executive and the Rionda vice president sealed with wax and placed in the latter's safe. After the transaction was completed, the two men met and destroyed the letter. Significantly also, after Rionda had declared title to the sugar to SuCrest but before the resale, Rionda declared title to the sugar on board the St. Etienne to another customer pursuant to a contract that had been made several weeks earlier. In other words, the transaction was, so far as Rionda was concerned, a total sham. The principal question before the jury was whether, so far as SuCrest and Rapaport were concerned, the transaction was the same.

The company's auditors questioned the subsequent resale despite the fact that there were separate documents for all of the transactions other than the agreement to resell or, on the part of Rionda, repurchase. The auditors in fact obtained an opinion letter from the company's attorneys which stated that, based upon representations received from SuCrest employees that as of the end of the fiscal year SuCrest had no commitment to resell and Rionda no commitment to repurchase the sugar, SuCrest did own the sugar at the end of the fiscal year. The auditors, who were told by Rapaport and Marshall that all data concerning commitments had been made available, that the scope of the auditors' examination had not been restricted, and that "goods for which the company was accountable to others ... had been excluded from inventories," were left in the dark as to the prearranged agreement of resale. SuCrest accordingly reported cost of goods sold on the basis of the year-end purchase of inventory, thereby understating the SuCrest 1975 operating profit by about $13.7 million.

SuCrest's fiscal year 1976 was also involved. The price of sugar declined after April, 1975, and another similar sale with Rionda was arranged, this time for 60,000 long tons of raw sugar. The only variations from the preceding year's elaborate arrangements were that SuCrest obligated itself to pay Rionda's commissions for the future trades, covered its own and Rionda's margin requirements, and instead of having a slight variation in the pricing formula was to give Rionda simply a straight $25,000 fee. The fixed differential in the pricing formula, that is to say the figure that was to be added to the price at which July, 1976, futures were trading on the day the raw sugar was purchased and on the day when it was eventually resold, was set at 3.25 cents per pound. The written contract of purchase by SuCrest was dated August 5, 1975, with title not to be declared until May, 1976, and delivery in June or July of 1976. Opposite and identical 1,200-lot futures positions were opened, although they were not shown on reports of open futures positions. In late May, 1976, Rionda declared title to SuCrest to the sugar in three vessels at sea in satisfaction of the August 5, 1975, contract, and during June, 1976, while the vessels were still at sea SuCrest resold the same sugar back to Rionda with the resale prices set according to the formula previously used containing a 3.25-cent fixed differential. The futures positions were mutually reversed, and again each party ended up in exactly the same position as it had been before except for Rionda's obtaining a $25,000 fee and about $74,000 in commissions. The 60,000 long tons of raw sugar were entered on the books and presented to the auditors as such. Meanwhile, however, the raw sugar buyer of SuCrest in the Sweetener Division had told one of the members of the auditing team "off the record" about the resale aspect of the 1976 transaction. False explanations for the resale were given to the auditors in Rapaport's presence by some of his managers, and questioning of a Rionda vice president elicited a response that the resale was unrelated to the original purchase by SuCrest. Again, the SuCrest auditors asked counsel for an opinion. Eventually the board of directors was advised by the company vice president who was president of the Sweetener Division that the resale had been prearranged. Audit procedures were expanded. Outside counsel was hired to ascertain the facts and concluded that the Rionda transactions had no substance and that the Rionda sugar purchase should not be included in the 1975 and 1976 computations of costs of goods sold. SuCrest filed its 1976 tax return based upon outside counsel's report and gave no recognition to the Rionda transactions.[1]

## DISCUSSION

The primary argument made by both SuCrest and Rapaport is that as a matter of

---

1. The SEC filed a complaint against the appellants here, Rionda and two other SuCrest executives, each of whom agreed to consent judgments. Rionda also pleaded guilty to two counts of assisting SuCrest in the presentation of false tax return information (26 U.S.C. § 7206(2)).

law the Rionda sugar was properly includable in SuCrest's LIFO inventory because SuCrest both had title and bore the risk of loss, satisfying the requirements for inclusion in inventory under the Internal Revenue Code Section 471[2] and Treasury Regulation Section 1.471–1.[3] SuCrest points to the portion of Regulation Section 1.471–1 which requires that "[m]erchandise should be included in the inventory only if title thereto is vested in the taxpayer .... although such merchandise is in transit" but should "exclude from inventory goods sold ... title to which has passed to the purchaser," an event which had not taken place here. *See also* Rev.Rul. 71–451, 1971–2 C.B. 217,[4] Rev.Rul. 81–272, 1981–2 C.B. 116. SuCrest argues that the Treasury Regulation makes "goods under a contract of sale" includable in inventory so long as SuCrest retains title; that SuCrest acquired the sugar "for sale" and not for use in SuCrest's business; and that title to the goods passed under New York Uniform Commercial Code Sections 2–401, 2–501, which in turn is said to have passed the risk of loss to SuCrest. *Id.* § 2–509. Thus, even if the oral understanding between SuCrest and Rionda amounted to a contract of resale, the argument runs, SuCrest could still include the sugar in its inventory. Moreover, it is said, the oral resale agreement involved the sale of goods in excess of $500 which was not an enforceable contract because it was not in writing as it must be under the New York Statute of Frauds. *Id.* § 2–201(1). It is also contended that the unsigned letter in the Rionda safe was not enforceable by SuCrest or Rionda because the executive who signed the letter on behalf of SuCrest never was authorized to do so. Support for this last point is said to lie in Rev.Rul. 71–451, 1971–2 C.B. 217, *see supra* note 4, and cases to the effect that it is immaterial that SuCrest may have intended to resell the sugar before it actually did sell. The hedging transaction was said to be a normal hedge which does not make for inventory ineligibility. *Monfort of Colorado, Inc. v. United States,* 561 F.2d 190 (10th Cir.1977); Rev.Rul. 74–226, 1974–1

**2.** 26 U.S.C. § 471 provides:

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

**3.** Treas.Reg. § 1.471–1 provided:

*Need for Inventories.* In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers), title to which has passed to the purchaser. A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected. (But see § 1.472–1.)

**4.** Rev.Rul. 71–451 involved a contract of sale or return used by a garden seed producer, which did not treat seeds delivered to dealers under such a contract as sales. Following *J.J. Little and Avis Co. v. Commissioner,* T.C. Memo 1966–68, the Service ruled that income accrued to the producer when title passed, i.e., on delivery to a common carrier, and that seeds so delivered could not be included in inventory. In that situation neither party knew what portion, if any, of the seeds would be returned, whereas here both parties knew that all the raw sugar would be returned. There the business purpose of the contract of sale or return was to give the dealers an inventory for resale to customers. Here there was no way in which SuCrest was to use the Rionda sugar.

C.B. 119;[5] Rev.Rul. 74–223, 1974–1 C.B. 23.[6] SuCrest made an elaborate argument to the jury and argues to us that because the futures prices involved cover only the cost of the raw sugar and not the cost of insurance and freight, that is to say, are on an FOB basis, whereas the price for a purchase of actual sugar is CIF, i.e., includes the cost of insurance and freight, the difference, that cost, amounts to the "CIF differential" which, of course, is also subject to a certain amount of market fluctuation. The theory presented is that the elaborate purchase of opposite and identical futures was so as to hedge the CIF differential which was not hedgable merely by going short on the futures contract.

Having satisfied the formal requirements of what it sees as the applicable rules, Su-Crest urges us to understand its elaborate machinations as a legitimate ploy to hold down taxes and directs us to the maxim that a person is entitled to arrange his taxes so as to pay only that which is due. But, of course, the taxpayer is not permitted to avoid taxes which *are* due and the invocation of the phrase tells us nothing about what must ultimately be rendered unto the I.R.S. any more than Socrates solved the thorny problems of justice by defining it to require that we give every person his due. *See* P. Westen, "The Empty Idea of Equality," 95 Harv.L.Rev. 537, 556–58 (1982). At best such maxims, which Roscoe Pound labeled "minims" because they revealed so little, *Sheppard v. United States,* 361 F.2d 972, 977 n. 9 (Ct.Cl.1966), are "singularly unhelpful when it comes to deciding cases." *Goldstein v. Commissioner,* 364 F.2d 734, 741 n. 7 (2d Cir.1966). As a starting point, they are at best confusing. *See, e.g., Grove v. Commissioner,* 490 F.2d 241 (2d Cir.1973). *See generally Commissioner v. Court Holding Co.,* 324 U.S. 331, 65

S.Ct. 707, 89 L.Ed. 981 (1945); *Gregory v. Helvering,* 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935).

These conclusory maxims are less confusing if we regard them *as* conclusions for substantive analysis and the substance underlying the transaction is taken to be the start. Two factors guide us here. First, we agree with Judge Learned Hand in dissent in *Gilbert v. Commissioner,* 248 F.2d 399, 412 (2d Cir.1957), that it is immaterial whether we are talking about "substantial economic reality," "substance over form," "sham" transactions, or the like; rather the question is whether under the statute and regulations here involved the transaction affects a beneficial interest other than the reduction of taxes. And here we note that the very first sentence of Section 1.471–1 makes inventories necessary in the first instance "in every case in which the production, purchase, or sale of merchandise is an *income-producing factor.*" (Emphasis added.) Thus, while title may be necessary for inclusion in inventory, it in itself is not alone sufficient, at least where the parties' purpose is solely tax avoidance. *See United States v. Balanovski,* 236 F.2d 298, 306 (2d Cir.1956), *cert. denied,* 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 (1957). Here, from the beginning, it was never intended that the sugar which was on board ship would be for SuCrest "an income-producing factor." On the contrary, it was never intended to be refined, and SuCrest was not in the business of selling or brokering raw sugar. SuCrest would have us give meaning to inventory which was never intended to be used or sold in the regular course of business. In fact, the transaction was designed *not* to earn money for Su-Crest. Irrespective of legal enforceability of the contract of resale, whether under

---

5. Rev.Rul. 74–226 dealt with commodities dealers on organized exchanges who are required to maintain inventories, and ruled that they are entitled to value goods on hand at market value when engaged in "carrying operations" or "straddles." There the purchase or sale of commodities was an income-producing factor.

6. Rev.Rul. 74–223 also dealt with commodities dealers and ruled that they may take into account gains or losses based upon the market value of such open futures contracts to which they are parties as are hedges against actual spot or cash transactions or against "forward" sales or purchases, but not of purely speculative transactions not offset by such transactions or such sales and purchases.

Restatement Section 90 or otherwise, the fact that Rionda was one of SuCrest's regular operators and was paid in effect a commission indicates that Rionda had a business interest in going through with the 1975 transaction, a business interest which was further demonstrated by its willingness to go through the same charade in 1976. There was absolutely no beneficial interest on the part of SuCrest except to inflate inventory for a few days solely for tax purposes, and there was no prospect of gain from the transaction; indeed it was sure to lose in terms of brokerage commissions and Rionda's fee for engaging in it, however depicted to SuCrest. The fact that Rionda's obligation to repurchase may have been unenforceable, however it may be examined, does not affect SuCrest's purpose to avoid taxes which would have occurred irrespective of such enforceability; the only thing that lack of enforceability shows, if indeed there were such, is that the scheme might not have succeeded in its true goal of losing money only to the extent of the brokerage commissions and fee to Rionda. This "beneficial interest factor" alone should be sufficient in this case to disqualify SuCrest's purchase from its LIFO base.

Second, as *Corliss v. Bowers,* 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930), stated broadly, "taxation is not so much concerned with the refinements of title as it is with *actual command* over the property taxed." (Emphasis added.) SuCrest argues that as of the end of the fiscal year it had title to the sugar and therefore enjoyed the right "to take possession of the sugar, to refine it, or to sell it," and suffered the hazard that "if the ships had sunk, or if the sugar had become so damaged as to become unmarketable, SuCrest would have had to bear the risk of economic and physical loss." Brief

at 31. This, of course, assumes that Rionda was not in fact in control of the sugar. On this score, Rionda had none of the illusions that SuCrest urges us to abide here: Rionda declared title to the sugar to third parties even before the sugar was sold back by SuCrest. It is only on the issue of actual control of the property that SuCrest's argument that its contract with Rionda was unenforceable has any significance. At the outset, we note that "[t]ax consequences follow what has taken place, not what might have taken place," *Central Tablet Manufacturing Co. v. United States,* 417 U.S. 673, 690, 94 S.Ct. 2516, 2526, 41 L.Ed.2d 398 (1974), and the resale agreement was completely obeyed here. Second, it would be high irony to find that the defendants here are immune to prosecution for their scheme because they never wrote it down. The reason it was never written down, and the reason that the copy sealed in wax was destroyed, is that such a document would prove that they had agreed to resell at the time of sale and would close the case against them in a prosecution like this one. In short, the contract was never written because it was illegal, and we decline the defendants' invitations to apply the Statute of Frauds not as a measure to protect the parties to contracts but as a means to promote frauds on the government.[7]

We conclude that the concept of inventory from an accounting point of view and the term inventory in the applicable Treasury Regulations would be meaningless were there to be included in the term or concept property bought, agreed to be resold, never intended to be utilized in the trade or business of the taxpayer (except for tax purposes), and in fact under the corporate taxpayer's dominion, control, and at its risk about as long as the pea in the proverbial shell game is under the shell.

---

7. We also duly note the nice distinction made in the SuCrest brief at 34 and n.* between unenforceable oral resale agreements such as were disregarded by the Court of Claims in a case involving the issue whether a bank holding municipal bonds as collateral for a bond dealer's loan was subject to the tax exemption for interest on municipal securities, *Citizens National Bank v. United States,* 551 F.2d 832, 841, 213 Ct.Cl. 236, 245 (1977), and cases involving a similar issue involving written and enforceable resale agreements, e.g., *Union Planters National Bank v. United States,* 426 F.2d 115 (6th Cir.1970) (lender did not assume risk of fluctuations in market value of bonds). The appellants would like to have us apply a similar distinction here, even though the issue before us relates to the entirely distinguishable category of inventories and not to the deductibility of interest on bonds held as collateral.

The next argument, which is on due process grounds but also goes to the court's exclusion of proffered expert testimony and refusal to instruct the jury, is that the convictions must be reversed because the applicable tax law was at least in such dispute that it was not sufficiently clear at the time of the Rionda transactions to provide a "clear and definite statement of the conduct proscribed" under *United States v. Chiarella,* 588 F.2d 1358, 1377 (2d Cir.1978) (dissenting opinion), *rev'd,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), thereby negating the element of willfulness or scienter.[8]

■ We agree that a criminal statute must meet the requirements of the Due Process Clause and be sufficiently definite as to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). *See also Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964). But as this court has noted,

> All the Due Process clause requires is that the law give sufficient warnings that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope.

*United States v. Herrera,* 584 F.2d 1137, 1149 (2d Cir.1978). And of course it is immaterial that "there is no litigated fact pattern precisely in point." *United States v. Brown,* 555 F.2d 336, 339–40 (2d Cir. 1977). Here surely the defendants knew

they were committing a wrongful act. *United States v. Dixon,* 536 F.2d 1388, 1397 (2d Cir.1976). The resale component of the agreement was concealed. The auditors were lied to, as were the attorneys. The secret letter sealed with wax was hidden in a safe and then destroyed. *Cf. United States v. Feola,* 420 U.S. 671, 685, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975) (conviction for assaulting federal officer upheld despite defendant's ignorance of victim's official identity). Willful intent was a question of fact decided by the jury at trial contrary to the defendants. *United States v. Pomponio,* 563 F.2d 659, 662 (4th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978).

■ The more sophisticated argument is made that the district court's exclusion of the testimony offered by two of defendant's experts, coupled with the decision of the trial court not to instruct the jury in terms of Treasury Regulation § 1.471–1, thwarted the defense that the defendants could not have formed a willful intent. Rapaport argues that the clarity of whatever legal duty was owed has become, in this case, an issue of fact and not of law. The defendants point to *United States v. Garber,* 607 F.2d 92 (5th Cir.1979) (en banc), a case involving a prosecution for tax evasion for having failed to report income from the sale of the taxpayer's blood containing a rare and valuable antibody, where the Fifth Circuit held exclusion of the testimony of a tax expert that in his opinion the income was not taxable was erroneous and reversed the conviction. Indeed, it is pointed out, the Fifth Circuit went further to say that the relevance of a dispute in the law "does not depend on whether the defendant actually

---

**8.** SuCrest and Rapaport concede that in 1979 the Internal Revenue Service issued Rev.Rul. 79–188, 1979–1 C.B. 191, which took the position that property not intended by the taxpayer to be used in business could not be included in inventory to avoid invasion of a LIFO base. But it is argued that the very fact that the Service issued this ruling proves that the question was not settled in 1975. The issuance of the LIFO Revenue Ruling in 1979 on which the appellants rely by no means signifies a lack of clarity in the law at the time the SuCrest-Rionda transaction was entered into in 1975. In the

first place, the ruling goes to different facts, since under it the purchase and resale were not prearranged, the prices were not structured to eliminate the possibility of profit or loss on the resale, and there were no indicia of concealment. Moreover, as Revenue Ruling 79–188 itself points out, "the purpose for which raw material is purchased is a major factor whether such material is inventoriable by the taxpayer," and has been since *Latimer-Looney Chevrolet, Inc. v. Commissioner,* 19 T.C. 120 (1952) *acq'd in* 1953–1 C.B. 5, which the Ruling cites for that proposition.

knew of the conflict." *Id.* at 98, citing *United States v. Critzer,* 498 F.2d 1160 (4th Cir.1974). *See also United States v. Clardy,* 612 F.2d 1139, 1153 (9th Cir.1980) (government expert's testimony relative to issue of willfulness admissible where defense theory is that there is good faith dispute as to tax law interpretation). We decline to apply the *Garber* reasoning for two reasons. First, the holding of that case was that in view of the defense that Ms. Garber "subjectively thought that proceeds from the sale of part of her body were not taxable" exclusion of an accountant's expert testimony that money obtained from the sale of blood plasma was not taxable income was reversible error. Here, however, there was no evidence that Rapaport or anyone else at SuCrest genuinely thought that what they were doing was lawful and proper; on the contrary, their conduct indicated a subjective belief in the *un*lawfulness of the conduct. Second, as pointed out in Note, *Criminal Liability for Willful Evasion of an Uncertain Tax,* 81 Colum.L.Rev. 1348, 1360 (1981), the *Garber* majority's approach permits juries to find that uncertainty in the law negates willfulness whether or not the defendants are actually confused about the extent of their tax liability. In contrast, prior cases on willfulness consistently require factual evidence of the defendants' state of mind to negate willfulness under

any theory. *See id.* at 1357. We agree with the *Garber* dissent, 607 F.2d at 105, that it would be very confusing to a jury to have opposing opinions of law admitted into evidence as involving a factual question for them to decide. Indeed, as that dissent points out, the inevitable logic of the majority's decision in *Garber* is that if the tax law is uncertain, the indictment should be dismissed. Questions of law are for the court. *United States v. Bronston,* 658 F.2d 920, 930 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *Marx & Co. v. Diners Club, Inc.,* 550 F.2d 505, 509–10 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). *See also* 7 Wigmore, *Evidence* § 1952 at 81. To the extent that *Garber* is inconsistent with our *Bronston* and *Marx* cases, we decline to follow it. We note that the Fifth Circuit has itself limited *Garber* in *United States v. Herzog,* 632 F.2d 469, 473 (5th Cir.1980) (expert's view of tax laws irrelevant to willfulness issues since complexity of laws sheds no light on defendant's intent).

The court's instructions were proper concerning willfulness, an issue which is a question of fact to be determined by the jury. *Spies v. United States,* 317 U.S. 492, 500, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). The instructions as set forth in the margin [9]

---

**9.** I instruct you that a transaction without economic substance which is entered into solely for the purpose of tax avoidance can't properly be used to compute taxes. The government contends that an agreement simultaneously to purchase and resell the same amount of raw sugar on terms that guarantee no risk of loss or chance for gain has no economic significance.

A taxpayer may of course try to pay as little tax as possible so long as he uses legal means. Transactions may be arranged in an attempt to minimize taxes if the transactions have economic substance. The defendants contend that the Rionda transaction had economic substance. They claim that SuCrest had title to the sugar purchased from Rionda, had risk of loss with respect to such sugar, had a binding obligation to resell the sugar at a fixed price and had a business purpose in entering into the Rionda transaction.

As a final instruction on this count, I will discuss certain terms you have heard used throughout the trial:

Inventories are defined by the Internal Revenue Code as raw material acquired for sale or manufacture in the ordinary course of business.

Inventories, as so defined, must be recorded on tax returns so as to clearly reflect income.

The government contends that the raw sugar involved in the Rionda transaction was not acquired for use in the ordinary course of SuCrest's business and that the sugar was thus not truly part of SuCrest's inventory.

. . . .

I told you that the defendants contended that SuCrest had title to the sugar purchased, that the Rionda transaction had economic [substance], that the title to the sugar purchased from Rionda had risk of loss with respect to the sugar and that the transaction had a business purpose.

I misstated. What I should have also told you is that they contend that the oral agreement to resell the sugar to Rionda was not

gave, in our opinion, all that is necessary: a fair presentation of the defense's contentions. *United States v. Park,* 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–1913, 44 L.Ed.2d 489 (1975). Instructions given in the precise terms of the Treasury Regulation would invite the jury to interpret the law which is, as we have said, a matter for the judge. *See United States v. Lanni,* 466 F.2d 1102, 1110 (3d Cir.1972).

 The remaining arguments of appellants are no more persuasive. They contend that in connection with the 1976 tax return no conspiracy to defraud was alleged because the transactions were not reflected in SuCrest's 1976 tax return and no such conspiracy was accordingly established. They rely on the decision in *United States v. Tarnopol,* 561 F.2d 466, 474 (3d Cir.1977), that the mere keeping of false books and records does not amount to a conspiracy to defraud the United States in connection with the collection of revenue under 18 U.S.C. § 371. A specific statute dealing with revenue matters was construed as early as *Haas v. Henkel,* 216 U.S. 462, 479, 30 S.Ct. 249, 253, 54 L.Ed. 569 (1910), to apply in the case of a corrupt agreement "calculated to obstruct or impair" the given governmental department's function. A conspiracy is, after all, an agreement to engage in prohibited conduct. *United States v. Herrera, supra,* 584 F.2d at 1150. It is immaterial that conspirators disband or are interrupted before the goal is achieved. *See United States v. Rosner,* 485 F.2d 1213, 1228–29 (2d Cir.1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); W. Lafave & A. Scott, *Criminal Law* 459 (1972). Recognizing that conspiracy-to-defraud prosecutions must be carefully scrutinized, *United States v. Rosenblatt,* 554 F.2d

36, 40 (2d Cir.1977), here the indictment and proof withstand such scrutiny since the criminal agreement was sufficiently established. *United States v. Tarnopol, supra,* is distinguishable, because there the Government failed to prove that the conspirators intended to defraud the Internal Revenue Service, even though they had not kept accurate business records. Here the whole purpose of the sale and resale transaction in 1976 as well as in 1975 was to evade federal taxes. As for the argument that a taxpayer has a right of "self-correction," it is clearly inapplicable to these defendants since it was only when the fraud was detected by the auditors that the scheme was dropped. *See United States v. James,* 609 F.2d 36, 41–42 (2d Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980). Requested instructions to this effect were therefore properly disallowed. In other words, Rapaport and his company did not go through with the ultimate fraud not because they "saw the light," but because the light saw them.

██ Appellants do have support, in connection with the Count Three charge of conspiracy to defraud in 1976, for their claim that the applicable statute of limitations is five rather than six years, and that 18 U.S.C. § 3282, the general five-year statute, is applicable rather than that portion of 26 U.S.C. § 6531(1), (8).[10] While 26 U.S.C. § 6531(8) expressly refers to 18 U.S.C. § 371, "where the object of the conspiracy is to attempt in any manner to evade or defeat any tax or the payment thereof," the argument is that this is not an offense "arising under" the Internal Revenue laws. Moreover, support is said to lie for the applicability of section 3282 in *Grunewald v. United States,* 353 U.S. 391, 396 & n. 8, 77

binding on either Rionda or on SuCrest. That is the defendant's contention.

**10.** 26 U.S.C. § 6531 provides in part:

No person shall be prosecuted . . . for any of the various offenses arising under the internal revenue laws unless the indictment is found or the information instituted within 3 years next after the commission of the offense, except that the period of limitations shall be 6 years—

(1) For offenses involving defrauding or attempting to defraud the United States or any agency thereof, whether by conspiracy or not and in any manner;

. . . .

(8) for offenses arising under Section 371 of Title 18 of the United States Code, where the object of the conspiracy is to attempt in any manner to evade or defeat any tax or the payment thereof.

S.Ct. 963, 969 & n. 8, 1 L.Ed.2d 931 (1957); *United States v. Klein,* 247 F.2d 908 (2d Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958); and *United States v. Witt,* 215 F.2d 580 (2d Cir.), *cert. denied,* 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954). Each of these cases states that an indictment alleging conspiracy under section 371 is governed by the statute of limitations set forth in 18 U.S.C. § 3282. We agree, however, with *United States v. Lowder,* 492 F.2d 953, 955–56 (4th Cir.), *cert. denied,* 419 U.S. 1092, 95 S.Ct. 685, 42 L.Ed.2d 685 (1974), that it was simply pure oversight in *Grunewald, Klein,* and *Witt* that reference was not made to the six-year statute, § 6531(1), (8). *See also United States v. Fruehauf Corp.,* 577 F.2d 1038, 1070 (6th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The error is understandable because section 3282 applies "[e]xcept as otherwise expressly provided by law," but the statute does not name the exceptive statutes and leaves the courts to search the United States Code for them, a search which did not lead to section 6531 in *Grunewald, Klein,* or *Witt.* In this respect this opinion has been circulated before filing to the active judges in this circuit, who have expressed no desire to hear the matter en banc.

SuCrest argues that its conviction on Count Four must be reversed because as a matter of law a corporation cannot be guilty of false declaration under 26 U.S.C. § 7206(1).[11] That section is described as a perjury statute and we are referred to the line of authority holding that corporations cannot commit perjury since a corporation cannot take an oath to tell the truth. *See* Note, 60 Harv.L.Rev. 283, 284 (1946); *United States v. John Kelso Co.,* 86 F. 304, 306 (N.D.Cal.1898). And it is said that the Service has itself interpreted § 7206(1) and its predecessor, § 3809(A) of the Internal Revenue Code of 1939, so as not to apply to corporations, an interpretation which, while not controlling, is entitled to considerable weight. *E.g., United States v. National Association of Security Dealers, Inc.,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). But "person" is defined in the Internal Revenue Code to refer to corporations, 26 U.S.C. § 7701(a)(1), and § 7206(1) refers to "[a]ny person" willfully making and subscribing any return or other document verified by a written declaration that it is made under the penalties of perjury. Moreover, in terms of the statutory history the 1939 Code § 52 provided that "[e]very corporation subject to taxation under this Chapter shall *make* a return" to be sworn to by a principal executive and a principal financial officer. (Emphasis added.) Individuals were by the Revenue Act of 1942 § 145(C) made subject to perjury penalties for willfully making and subscribing false returns and the 1949 amendments to the Code adding § 3809(A) covered any person, a term including trusts, estates, partnerships, associations, companies, and corporations. *See* Sections 1426(f), 1532(i), 1607(k), 1805, 1931(b), 2733(i), 3228(2), 3238(a), 3797(a)(i) (1939), now collected in 26 U.S.C. § 7701(a). While a corporation has no independent state of mind, the acts of individuals on its behalf may be properly chargeable to it. *See United States v. Demauro,* 581 F.2d 50, 53 (2d Cir.1978); *J.C.B. Super Markets, Inc. v. United States,* 530 F.2d 1119 (2d Cir.1976). Other circuits have agreed under other analogous statutes. *United States v. Lange,* 528 F.2d 1280 (5th Cir. 1976) (18 U.S.C. § 1001); *United States v. Milton Marks Corp.,* 240 F.2d 838 (3d Cir. 1957) (18 U.S.C. § 287). Moreover, the Internal Revenue Service has in fact prose-

11. 26 U.S.C. § 7206(1) provides:
 Any person who—
 ... [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter[,]

 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

cuted other corporations for violations of § 7206(1). *See, e.g., United States v. Minnesota Mining & Manufacturing Co.*, 428 F.Supp. 707 (D.Minn.1976) (indictment dismissed on other grounds), *aff'd*, 551 F.2d 1106 (8th Cir.1977).

We have examined the other contentions of the appellants and find them without merit.[12]

Judgment affirmed.

---

**12.** First, Rapaport's argument that his cross examination of witnesses was unfairly limited at best applies to the attempted re-cross of the witness Azarow who had been cross-examined for what amounts to 170 pages of final transcript. Moreover, Judge Carter aptly noted that the pedantic concerns of counsel on re-cross were designed "to confuse and not clarify." Second, Rapaport's only tenable argument against the admission of SuCrest's 10–K Reports to the Securities and Exchange Commission is that it might have been misunderstood to apply to Rapaport as well as to SuCrest, an allegation mitigated by the court's repeated instruction to the jurors that these statements did not apply to Rapaport. Third, the government introduced evidence that SuCrest had not even recorded the receipt of the Rionda sugar in its files, but the records introduced covered two weeks and not the week that intervened between them. The prosecution explained the missing week by noting to the jury, after the defense was given an opportunity to introduce a witness or submit a reason for the failure of the records to cover the relevant week, that the files contained no report for the intervening week. The statement would by no means necessarily lead the jury to believe that the "defendants had suppressed or otherwise despoiled potentially critical evidence," and any risk that this would happen could have been cured by SuCrest through testimony or suggested explanations to be included in the prosecutor's statement. Finally, Judge Carter's instruction cautioning the jury that Rapaport's failure to testify could not be used to infer his guilt substantially mirrored the one approved by this court in *United States v. Lopez*, 584 F.2d 1175, 1179 (2d Cir.1978), and we decline to disapprove it here.