PACCAR, INC. and Subsidiaries, Petitioners–Appellants,

v.

COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellee.

No. 87–7203.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1988.

Decided June 9, 1988.

---

John T. Piper and Joseph McIntosh, Bogle & Gates, Seattle, Wash., for petitioners-appellants.

Michael L. Paup, Richard Farber, David I. Pincus, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before ANDERSON * and FLETCHER, Circuit Judges, and CARROLL,** District Judge.

CARROLL, District Judge:

Paccar, Inc., appeals from a decision of the United States Tax Court, 85 T.C. 754 (1985), upholding the determination of deficiencies assessed by the Commissioner for the tax years 1975 through 1977. The primary issue is whether Paccar may claim an inventory loss resulting from its transfer of equipment parts to a third party. We affirm.

Paccar, through its various divisions, engages in the manufacture and distribution of trucks, truck parts, mining vehicles, and rail cars. In 1976 and 1977, three divisions of Paccar (Paccar Parts, Dart, and Wagner) entered into written agreements with Sajac Company, Inc., an unrelated corporation, for the disposition of certain inventory of equipment parts. The agreements provided: (1) Sajac would purchase "selective excess, inactive or unusable parts hereinafter referred to as scrap material" at the pre-

---

* Judge Anderson concurred in this opinion prior to his death.

** Honorable Earl H. Carroll, United States District Judge, District of Arizona, sitting by designation.

vailing market price for scrap metals; (2) title, ownership and "risk of loss" would pass to Sajac, and the Paccar division would pay the costs of shipping to Sajac's warehouse; (3) Sajac was "not, in any manner, express or implied, a bailee of the scrap material, nor is Sajac in any way an agent of" the Paccar division; (4) the Paccar division retained the right to repurchase any portion of the "scrap material" sold to Sajac for at least four years after delivery of the goods to Sajac, and Sajac would advise the Paccar division of "any other disposition of the goods during this period of time;" and (5) the repurchase cost to the Paccar division would not exceed 90 percent of the Paccar division's last acquisition cost, adjusted for inflation, and the repurchase cost would be discounted if the Paccar division's repurchases exceeded certain levels. During the years at issue and in subsequent years, Paccar reacquired an average of approximately 25 percent of the inventory transferred to Sajac.

Beginning in 1976, parts were transferred to Sajac by the Paccar divisions that had entered into the above agreement with Sajac. Paccar treated the transfers of the materials to Sajac as sales for both accounting and tax purposes. Sajac likewise treated the transfers as purchases for both accounting and tax purposes. Paccar and Sajac also treated any "repurchases" as purchases and sales, respectively, for accounting and tax purposes.

The trucking industry has a policy of supplying replacement parts for trucks for seven years from the date the truck was manufactured. Paccar Parts, one of the Paccar divisions which had signed an agreement with Sajac, warehouses and distributes truck parts for the Kenworth and Peterbilt divisions of Paccar. Kenworth exceeded the industry standard and in some cases supplied replacement parts for Kenworth trucks that were more than 25 years old.

When a Kenworth or Peterbilt customer ordered a replacement part which Paccar Parts neither had in stock nor was able to obtain from other vendors, then Kenworth or Peterbilt, in order to honor its commitment to its customer, would either manufacture the part in single or small lot quantities or have the part built in one of its fabrication shops. Single or small run manufacture was disadvantageous to Paccar because it disrupted the manufacture of current production parts, involved expensive setting up of machines to manufacture the part, took from two to six weeks to complete, and resulted in the customer receiving a part at an inflated cost and after a long wait.

Paccar Parts could not accurately project the demand for slow-moving, surplus, and obsolete parts. Executives at the company knew from past experience, however, that some of the parts scrapped or disposed of as surplus and obsolete would ultimately be needed by owners of Kenworth or Peterbilt trucks. Paccar Parts wanted to keep a lifetime supply of all usable replacement parts for Kenworth and Peterbilt trucks available, even if the parts were slow-moving, surplus, or obsolete.

Paccar Parts had 64,459 part number records on its computer file. At least 26,666 of those represented parts that were not located on any of its warehouse shelves, but were available at Sajac or from another source.

In April 1976, before the Paccar agreements with Sajac were made, Jack Lemon, the owner of Sajac, provided information to the Paccar divisions, including Paccar Parts, about Sajac's "unusual service." The information stated, "[w]e are a LONG TERM DORMANT WAREHOUSE that provides manufacturers with all of [the] TAX and SPACE SAVING benefits of scrapping excess and inactive noncurrent inventory—yet they retain its availability for possible future sale." The information also stated, "our customers have generally owned our inventory 1 to 3 years before we buy it—and we keep it another 4 to 12 years." At a subsequent meeting between Lemon and Don Luther, materials manager for Paccar Parts, Sajac proposed warehousing the inventory from Paccar Parts for a period of up to 14 years; if a part in a container of inventory was "resold" to Pac-

car Parts within 5 years, Sajac would keep the entire container for up to 14 years.

In August 1976, Hank Uhthoff, materials disposition manager at Paccar Parts, described the Sajac program in a memorandum to the tax manager of the corporate legal department. The memorandum stated in part, "[c]ontractually we cannot maintain a semblance of control and still enjoy our arms length legal consideration of 'a sale.' However, by agreement, Sajac will scrap material at the end of a specified time, witnessed by a PACCAR Parts employee or agent ... Verbally, Sajac agrees to resell the material to us at scrap price to fulfill any future IRS disagreement of our position."

The memorandum also stated, "Sajac will not sell to anyone but PACCAR Parts. This is their current posture with existing customers. We realize that this cannot be contractually specified and still allow for an 'arms length' position." Finally, the memorandum notes "IRS regulations preclude write off of scrapped material that has *not* been defaced or made unusable. It is acknowledged that we are in technical violation of this rule in our current scrap program confirmed by recent Internal Audits. However, Accounting considers our risk to be minimal and insignificant contrasted to total inventory dollar figure." In another memorandum to his staff in November 1976, Uhthoff again stated, "Sajac sells only to their manufacturers."

On December 6, 1976, Uhthoff wrote in an interoffice memorandum that "[s]erious attention is being given in developing controls and monitoring devices for Sajac." Uhthoff noted, however, that, "caution must be exercised. This cannot be controlled contractually and still maintain a semblance of an arm's-length transaction. Hence, procedural controls are paramount."

In October, 1977, Paccar's accounting department issued an accounting procedure bulletin which set forth a "suggested priority" to be used in disposing of surplus and obsolete material. On the list of priorities, the seventh item was "sell to Sajac or similar inventory management company" and eighth on the list was "mutilate and scrap." Despite this stated policy, however, Paccar sent inventory to Sajac "as a matter of course in order to retain the parts for future shipment to dealers but at the same time to attempt to achieve tax benefits as if the inventory had been sold." *Paccar*, 88 T.C. at 781.

On its federal income tax returns, Paccar claimed inventory losses, based on the "sales" to Sajac, of $414,591 in 1976 and $336,483 in 1977. The Commissioner of Internal Revenue disallowed the losses, stating:

It is determined that you retained such a degree of control over the use and disposition of the inventory parts as to prevent the sales from being closed and completed transactions so that the claimed losses are not allowable. In addition, it is determined disallowances of such inventory losses are necessary in order to clearly reflect income. Accordingly, your income is increased $414,591 in 1976 and $336,486 in 1977.

Paccar filed a petition for a redetermination of the deficiencies. The tax court held in favor of the Commissioner, finding that Paccar retained "the same control over the inventory that it had before shipping it to Sajac."

## I

### Inventory Loss

Paccar contends the tax court erred by disallowing the inventory losses claimed on the transfers to Sajac because the transfer was a bona fide sale.[1] Because the primary issue here is whether the facts fall within the relevant legal definition, we apply the de novo standard of review. *See United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Although "the characteristics of a

1. Sajac Company, Inc., filed an amicus brief also contending the transfer by Paccar was a bona fide sale.

transaction are questions of fact, whether those characteristics constitute a sale *for tax purposes* is a question of law." *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1047 n. 3 (9th Cir.1976) (emphasis in original); *see also Swift Dodge v. Commissioner*, 692 F.2d 651, 652 (9th Cir.1982) ("[w]hether the agreement is a 'sale' or a 'lease' for federal tax purposes is a question of law and is therefore fully reviewable on appeal"). The facts upon which the tax court based its conclusion, however, are upheld unless clearly erroneous. *McConney*, 728 F.2d at 1200–01.

■ The economic substance of a transaction, rather than its form, governs whether a transaction is a bona fide sale for income tax purposes. *See Gregory v. Helvering*, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978) (court looks to "the objective economic realities of a transaction rather than to the particular form the parties employed"); *Swift Dodge v. Commissioner*, 692 F.2d 651, 652–54 (9th Cir.1982) ("characterization of a transaction for federal tax purposes is controlled by the substantive provisions of the agreement and the parties' conduct, rather than by the particular terminology used in the agreement"). Here, the record shows that despite the terminology used by Paccar and Sajac in their written agreement, Paccar retained control equivalent to ownership over the transferred parts. Although the sale was structured as an "arms length" transaction, the parties nevertheless: verbally agreed Sajac would not sell the parts to anyone but Paccar; developed "procedural controls" and "monitoring devices" for Sajac's management of Paccar inventory; transferred inventory to Sajac "as a matter of course ... to attempt to achieve the tax benefits as if the inventory had been sold;" described the Sajac "program" as a "warehouse" and "inventory management compa-

ny;" verbally agreed to resell the material to Paccar at the scrap price if the tax benefits were disallowed; and treated the transfer as a sale/purchase for tax and accounting purchases even though Paccar admittedly knew that IRS regulations precluded write off of the material as scrap where it had not been defaced or made unusable.

In *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 545–46, 99 S.Ct. 773, 787–88, 58 L.Ed.2d 785 (1979), the Supreme Court held that a taxpayer could not retain excess inventory items for sale at their original price and at the same time declare inventory losses resulting from lowering the inventory valuation carried on the taxpayer's records to scrap value. Here, the motivation for the transaction was, in the tax court's words, a "thinly veiled subterfuge of a 'sale'" which was "designed to circumvent our holding in *Thor.*"[2] *Paccar*, 85 T.C. at 782, 783.

Paccar argues that the transfer of title effected by the written agreements with Sajac should be "entitled to considerable weight." They cite treasury regulations stating that merchandise "should be included in inventory only if title thereto is vested in the taxpayer" and the taxpayer "should exclude from inventory goods sold ... title to which has passed to the purchaser." Treas.Reg. § 1.471–1. Any purported "sale" of inventory under this regulation, however, must be bona fide in order for ownership of the inventory to be considered to have passed from the "seller" to the "buyer." *See* Rev.Rul. 83–59, 1983–1 Cum.Bull. 103, 105; *Estate of Nottingham v. Commissioner*, 25 T.C.M. (P–H) ¶ 56,281, at 1195–96 (1956); *see also United States v. Ingredient Technology Corp.*, 698 F.2d 88, 92–95 (2d Cir.) (no deductible loss where title transferred to "purchaser" but no "dominion" or "control" over goods passed), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). The

---

**2.** Although the agreements here took place in 1976 and 1977, and the *Thor* opinion did not issue until 1979, the parties would presumably have been aware of the 1975 tax court decision in *Thor*, which was ultimately affirmed by the Supreme Court. *See Thor Power Tool Co. v. Commissioner*, 64 T.C. 154 (1975), *aff'd*, 563 F.2d 861 (7th Cir.1977), *aff'd*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979).

transfer of title alone, therefore, is not determinative of a sale.

Paccar additionally contends the repurchase provisions should not prevent treatment of the agreement as a sale. In the written agreement, Paccar retained the right to repurchase and Sajac would advise Paccar of "any other disposition" of the parts. The parties verbally agreed, however, that no other disposition would be made; therefore, Paccar's right to "repurchase" the goods was exclusive. An agreement not to sell or dispose of the inventory to anyone other than the original "seller" defeats an attempt to establish a bona fide sale. *See* Rev.Rul. 83–59, 1983–1 C.B. 103, 106.[3] The Second Circuit decision in *United States v. Ingredient Technology Corp.*, 698 F.2d 88 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), is particularly appropriate here. There, the parties to the "sale" had a written agreement to sell and a separate verbal agreement to repurchase. *Id.* at 95. The court stated, "it would be high irony to find that the defendants here are immune to prosecution for their scheme because they never wrote it down. The reason it was never written down ... is that such a document would prove that they had agreed to resell at the time of sale and would close the case against them." *Id.* The verbal agreement for exclusive repurchase further demonstrates that Paccar retained control of the inventory, defeating the existence of a bona fide sale.

Paccar also contends the method of computing compensation for Sajac demonstrated Sajac's ownership of the inventory. Sajac received compensation based upon the amount of parts "repurchased" by Paccar, rather than a fee based upon amount and duration of storage. The record shows, however, that Sajac's compensation equaled the fair market value for storage services.[4] Although in theory, Sajac might have risked receiving compensation lower than its storage costs, "[t]ax consequences follow what has taken place, not what might have taken place." *Central Tablet Manufacturing Co. v. United States*, 417 U.S. 673, 690, 94 S.Ct. 2516, 2526, 41 L.Ed. 2d 398 (1974); *Ingredient Technology*, 698 F.2d at 95; *see also* Rev.Rul. 83–59, 1983–1 C.B. 103, 106 (finding no sale under similar facts where the "compensation for these storage and management services is the difference between the scrap value of the 'excess' inventory and the amount to be derived from the repurchase ... of some, if not all, of the 'excess' inventory"). Even though Paccar argues that transfer of the risk of loss has been a factor in various decisions determining whether a sale occurred, no significant transfer of risk to Sajac took place here. Therefore, the method of compensation does not establish ownership of the inventory.

In its amicus brief, Sajac additionally contends that its "business plan" should be considered as a "solution" to a general economic problem. This "problem" is the same as that identified by the Court in *Thor*: "either the unsalable inventory must be carried for years at its cost instead of net realizable value, thereby overstating taxable income by such overvaluation until it is scrapped, or the excess inventory must

---

**3.** Paccar's contention that this revenue ruling is distinguishable on its facts lacks merit. The hypothetical facts in the ruling are identical to those here, including an agreement that the taxpayer "may repurchase any portion of the inventory," and during the relevant tax year the taxpayer bought a "portion" of the inventory. Rev. Rule 83–59, 1983–1 C.B. 103, 104. Paccar points out the language stating that the taxpayer "is compelled to repurchase most, if not all, of the excess inventory." *Id.* at 106. Paccar claims this distinguishes the ruling from its own agreement because Paccar was not required to "repurchase" any of the inventory under the terms of its agreement. The "compulsion to repurchase" referred to in the ruling, however, did not derive from the agreement but rather

"because [taxpayer] needs a supply of parts to sell to its customers." *Id.* at 106. This same "compulsion" caused Paccar to "repurchase" its inventory from Sajac, in order to honor commitments to its customers, thereby making the claimed difference nonexistent.

**4.** Paccar appears to misunderstand the substance of this testimony in its brief. Paccar asserts that "[t]he Commissioner's economist has agreed the repurchase price was fair market value." The testimony of the economist, however, was that the price was the fair market value for storage and *not* a fair market value for repurchase.

be scrapped prematurely to the detriment of the manufacturer and its customers." *Thor*, 439 U.S. at 545, 99 S.Ct. at 787. The Court, although recognizing the problem, concluded:

> [this] is in reality the same choice that every taxpayer who has a paper loss must face.... Thor now has inventory it believes it cannot sell. Thor, of course, is not so confident of its prediction as to be willing to scrap the "excess" parts now; it wants to keep them on hand, just in case. This ... is a rational judgment, but there is no reason why the Treasury should subsidize Thor's hedging of its bets. There is also no reason why Thor should be entitled, for tax purposes, to have its cake and to eat it too.

*Id.* at 545–46, 99 S.Ct. at 787–88.

Sajac further argues that its storage system is more economically efficient than other alternatives available to its customers. Sajac is free to sell its warehousing services on their own merits; however, the existence of efficiencies does not determine the legal issue of whether tax benefits should accrue to Sajac's customers. Because Paccar retained the same control over the inventory that it had before shipping it to Sajac, the tax court properly concluded that the transfer did not constitute a "sale," and did not err by disallowing Paccar's claimed inventory losses on the transfer.

## II

### Rule 155 Proceeding

■ Paccar contends that the tax court erred by precluding consideration of Paccar's challenge, raised at a post-trial proceeding, to the amount disallowed by the Commissioner for the claimed inventory "loss." The tax court, after rendering its opinion determining the issues in a case, may withhold entry of its decision for the purpose of permitting the parties to submit computations pursuant to the court's determination of the issues. Tax Ct.R. 155(a). If the parties disagree as to the amount of the deficiency, the tax court may hear argument regarding the disagreement in a post-trial proceeding. Tax Ct.R. 155(b). In any such post-trial proceeding, however, "no argument will be heard upon or consideration given to ... any new issues." Tax Ct.R. 155(c).

The tax court, in its opinion disallowing Paccar's claimed loss on its "sale" to Sajac, stated that its decision would be entered under Rule 155. The Commissioner offered a computation of deficiency identical to the figures in its original notice of deficiency to Paccar. Paccar offered a computation different from the Commissioner's, claiming that the increase in Paccar's income originally determined by the Commissioner in connection with the inventory issue was inaccurate[5] because the Commissioner had failed to take into account Paccar's LIFO inventory accounting method.[6] The tax court held that Paccar's argument in support of its proposed figures raised a new issue that could not be raised for the first time at the Rule 155 proceeding.

Paccar argues this is not a "new issue" because there is no controversy, "nothing but the routine computation applying LIFO rules." The matter, however, is anything but routine; the tax court found that in order to determine whether Paccar's proposed computation was accurate, "it would be necessary to reopen the record to permit [Paccar] to put in the necessary portions of its books and records to show the basis of its claimed adjustment to the amount it originally claimed on its return as a loss on the sale of the Sajac inventory, which was disallowed in full by [the Commissioner] in the notice of deficiency." Paccar did not challenge the computation in the original pleadings or proceedings. Because the resolution of the matter would have required the tax court to consider new evidence not

---

**5.** Paccar claimed that the Commissioner's figure was too low for 1976 by $5 and too high for 1977 by $184,497.

**6.** The LIFO (last-in, first-out) inventory accounting method treats the last items added to inventory as the first items sold, generally benefiting a taxpayer in a period of rising costs by attributing to goods sold the costs of the last (and most costly) additions to inventory. *See generally* Treas.Reg. § 1.472–1.

presented at the original proceeding,[7] the tax court did not err by precluding consideration of the issue at the Rule 155 proceeding. *See Bankers Pocahontas Coal Co. v. Burnet,* 287 U.S. 308, 313, 53 S.Ct. 150, 151, 77 L.Ed. 325 (1932) (prohibiting taxpayer from raising new issue in postdecision tax deficiency proceeding: "[i]t is not shown that the evidence tendered was not available to the petitioner in ample time to present it before the Board had made and filed its findings of fact and opinion"); *see also Cloes v. Commissioner,* 79 T.C. 933, 937 (1982) ("a further trial is exactly what is not permitted under Rule 155"); 2 L. Casey, *Federal Tax Practice,* § 7.14 (1981 rev.) ("[n]ot only may the petition contain alternative assignments of error, but it must contain such assignments if the alternative issues are to be considered by the Tax Court" [footnotes omitted]).

### III

### Burden of Proof

Paccar further contends the tax court erred by failing to shift the burden to the Commissioner of going forward with evidence of a correct deficiency amount for income resulting from a sale by Paccar to its subsidiary, Paccint. The notice of deficiency included a determination disallowing the 10 percent discount Paccar granted to its wholly-owned subsidiary, Paccint, in its sales to Paccint of Paccar trucks and parts. At the trial, Paccar contended the 10 percent discount was justified and clearly reflected Paccar's income. The Commissioner's expert testified that some discount was necessary, but less than 10 percent; the expert recommended, based upon factors addressed in his testimony, the use of a discount based upon the comparable uncontrolled price method for parts and the re-

sale price method on truck units.[8] The tax court determined that the full 10 percent discount was appropriate with respect to part sales, but that the resale price method recommended by the Commissioner's expert would be used for determining the allowable discount for truck units. Paccar argues that where the tax court has declined to adopt the Commissioner's original deficiency determination, the Commissioner has the burden of going forward with evidence of the correct deficiency amount.

The Commissioner is authorized to reallocate gross income or deductions between commonly controlled organizations where such allocation is necessary either to prevent the evasion of taxes or in order to reflect clearly the income of such corporations. 26 U.S.C. § 482. An assessment of deficiency by the Commissioner is presumed to be correct. *Adamson v. Commissioner,* 745 F.2d 541, 547 (9th Cir.1984); *Weimerskirch v. Commissioner,* 596 F.2d 358, 360 (9th Cir.1979). This presumption is not rebutted where the Commissioner has provided some evidentiary foundation for its assessment. *Adamson,* 745 F.2d at 547; *Weimerskirch,* 596 F.2d at 362. Where the Commissioner has conceded errors in his original computations, and the tax court has sustained the Commissioner's corrected determination, those errors are not a basis for overcoming the presumption of correctness. *Adamson,* 745 F.2d at 548.

Here, the Commissioner's expert provided a corrected determination of the deficiency for parts and truck units. Paccar does not contest the allowance of its claimed 10 percent discount on parts sales. Because the errors in the original determination were conceded by the Commissioner and corrected by the tax court, and the

7. The cases relied upon by Paccar are all distinguishable on this issue; in the decisions which have found no "new issue" to exist, the evidence necessary to resolve the dispute between the parties was already in the record or within the scope of the evidence to be presented in support of issues already pleaded. *See Commissioner v. Superior Yarn Mills,* 228 F.2d 736, 741 (4th Cir.1955); *W.H. Armston Co. v. Commissioner,* 188 F.2d 531 (5th Cir.1951); *Commissioner v. Ray,* 88 F.2d 891 (7th Cir.1937).

8. The expert's recommendations were based upon the required methods for determining an "arm's length price" between commonly controlled organizations under Section 482. *See* Treas.Reg. § 1.482–1(e)(1)(ii) (setting forth three methods for determining an arm's length price: the comparable uncontrolled price method, the resale price method, and the cost plus method).

corrected determination was supported by some evidentiary foundation provided by the Commissioner's expert, the tax court did not err by sustaining the Commissioner's determination. *See Adamson,* 745 F.2d at 548. AFFIRMED.